IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-00109-WMJ-CBS

MIKEAL STINE,

        Plaintiff,

v.

DR. D. ALLRED, Clinical Director, ADX,

        Defendant.

---

**CORRECTED[1] ORDER DENYING PLAINTIFF'S VERIFIED EMERGENCY
MOTION FOR TRO AND PRELIMINARY INJUNCTION**

---

Magistrate Judge Shaffer

      THIS MATTER comes before the court on *pro se* Plaintiff Mikeal Stine's "Verified

Emergency Motion for TRO and Preliminary Injunction" (doc. 35) filed on March 15, 2011.  Mr.

Stine also filed, *ad seriatim*, a "Request to Supplement Verified Emergency Motion for

TRO/Preliminary Injunction" (doc. #61) on April 4, 2011; a "Motion for Leave to File Attached

Supplement to Verified Emergency Motion for TRO/Preliminary Injunction" (doc. #67) on April

8, 2011; a "Request [for] Leave of the Court to Supplement Motion (35) Emergency

TRO/Preliminary Injunction with New Evidence Just Obtained" (doc. #69) on April 11, 2011; a

"Request [for] Leave of the Court to File Declaration and Medical/Dental Report" (doc. #70) on

April 11, 2011; a compilation of "Cases in Support of [Plaintiff's] Position for Conference

---

[1] Modified only to remove the *Advisement to the Parties* from page 29 as the court is
issuing an Order not a Recommendation.

Hearing Scheduled for Thursday April 14, 2011 (doc. #74) on April 11, 2011; and Plaintiff's "Verified Supplement to Docket No. 1, Prisoner Verified Complaint" (doc. #89) on April 21, 2011.

Defendant Dr. David Allred, D.O., filed his "Response to Motion for TRO and Preliminary Injunction and Supplements (Docs. 35 & 61, 67, 69-10)" (doc. #93) on April 27, 2011, and submitted additional exhibits on May 4, 2011 (doc. #104) in anticipation of the May 5, 2011 hearing.  Mr. Stine filed a "Verified Updated Status Report Related to Plaintiff's Medical/Dental Condition" (doc. #97) and a "Declaration in Relation to [Plaintiff's] Advanced Injury/Condition" (doc. #99).  On May 2, 2011, Mr. Stine filed his "Reply to Defendant's Response to Motion for TRO/Preliminary Injunction and Supplements" (doc. #101), and a "Supplement" to his Reply in Response to Motion for TRO/Preliminary Injunction and Supplements (doc. #109) on May 9, 2011.

On March 18, 2011, District Judge William J. Martinez issued an Order Regarding Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (doc. #39), in which he requested that the parties "consider agreeing to a partial consent to allow Magistrate Judge Shaffer to decide Plaintiff's motion by Order instead of recommendation."  Mr. Stine consented to allow this court to decide the pending motion by filing a "Notice of Position" (doc. # 46) on March 24, 2011.  Counsel for Defendant Allred submitted a comparable partial consent (doc. #54) on March 29, 2011.

The court has carefully considered the parties' briefs and attached exhibits, the above-referenced submissions and the entire court file, the applicable case law, and the evidence and arguments presented during the hearing on May 5, 2011.  For the following reasons, Mr. Stine's

motion for injunctive relief is denied.

## PERTINENT FACTUAL BACKGROUND

The *pro se* Plaintiff, Mikeal Stine, currently is incarcerated at the United States

Pennitentiary, Administrative Maximum ("ADX") in Florence, Colorado, having been sentenced

on April 29, 2004 to 262 months incarceration.  Mr. Stine's original Complaint (doc. # 1), filed

on January 14, 2011, named as defendants the Federal Bureau of Prisons ("BOP"); Harley

Lappin, the Director of the Bureau of Prisons; Michael Nalley, a BOP Regional Director; Blake

Davis, the Warden of ADX; Dr. David Alllred, the Clinical Director of ADX; Physician's

Assistant A. Osagie; Ms. Patricia Rangel, the ADX D-Unit Manager; Ms. Tina Sudlow, D-Unit

Case Manager; and D. Foster, a D-Unit Counselor.  The original Complaint invoked the court's

jurisdiction under 28 U.S.C. § 1331 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388

(1971).  The first claim for relief asserted violations of the Eighth Amendment based upon a

denial of dental and medical care.[2]  The second claim for relief was characterized as "8th

Amendment Violation/Medical Care not Provided for Serious Injury Cruel + Unusual

Punishment."  The original Complaint also alleged a third claim for relief described as "False

Imprisonment in Control Unit" and a fourth claim for relief that Mr. Stine characterized as

"Unsafe Incarceration in Violation of Eighth Amendment."

On February 1, 2011, Magistrate Judge Boland issued an Order (doc. #9), in which Mr.

---

[2]This is not Mr. Stine's first lawsuit alleging inadequate dental care.  In October 2007, Mr. Stine filed a Prisoner Complaint in Civil Action No. 07-cv-02203-WYD-KLM in which he alleged that Dr. Lorincz was deliberately indifferent in providing medical treatment for a "section of lower left side of the jaw bone inside my mouth bust through the skin and sharp splinters of bone cutting into my tongue."  That claim against Dr. Lorincz in his individual capacity was dismissed on September 19, 2008 based on Dr. Lorincz's immunity from suit as a Public Health Service employee.

Stine was reminded of the filing restrictions that had been imposed on him in Case No. 07-cv-01839-WYD-KLM.  Judge Boland noted that "[a]lthough Mr. Stine is aware of the requirements, he continues to engage in abusive litigation tactics by not complying with the requirements." While Magistrate Judge Boland acknowledged that "Mr. Stine continues to abuse the judicial process as is documented with specificity in Case No. 07-cv-01839-WYD-KLM," he directed that Warden Davis submit a statement "addressing the current provisions being made to assure that Mr. Stine is not in immediate danger of physical harm regarding his dental needs, specifically his abscessed teeth, and his medical needs, specifically his injured knee." On February 10, 2011, Warden Davis filed his Response (doc. #13) to Magistrate Judge Boland's Order.  Appended to Warden Davis' Response were several documents, including a Declaration of David K. Allred, D.O. (doc. # 13-1) and excerpts from Mr. Stine's medical records.[3]

On March 7, 2011, District Judge Lewis T. Babcock entered an Order to Dismiss in Part and to Draw Case to a District Judge and to a Magistrate Judge (doc. #20).  Having reviewed Dr. Allred's Declaration and the attached medical records, Judge Babcock ordered that "the dental claims Mr. Stine asserts against Defendant Dr. D. Allred . . . be drawn to a district judge and a magistrate judge, even though Mr. Stine has not complied with the restrictions set forth in Case No. 07-cv-01839-WYD-KLM."  In the same Order, Judge Babcock instructed Mr. Stine that "he is to refrain from filing any further pleadings in this case unless directed to do so by the Court."[4]

---

[3]Magistrate Judge Boland's February 1, 2011 Order specifically prohibited Mr. Stine from filing a reply to Warden Davis' statement.

[4]Rule 7 (a) of the Federal Rules of Civil Procedure limits the term "pleadings" to include a complaint, an answer to a complaint, an answer to a counterclaim, an answer to a crossclaim, a

All other claims raised in the original Complaint and all defendants save Dr. Allred were dismissed from this action.

The first claim for relief in the original Complaint sought to impose liability on Defendant Allred in his official and individual capacity based upon an alleged denial of dental care in violation of the Eighth Amendment.  More specifically, the original Complaint alleged that during "the last week of November 2010," Plaintiff  advised "ADX Health Services (Dental)" that he had "1-2 teeth abscessed very painful, swelled and disallowing me to eat the majority of my meals."  Mr. Stine asserted that notwithstanding his request for treatment, he was denied dental care "which has allowed the infection to spread to all upper teeth that will now cause them the need of extraction, additionally teeth abscesses has allowed the infection to travel to brain and cause death."  The original Complaint also contends that the inmates at ADX "generally have more extensive dental problems than the average citizen and consequently dental care is one of the most important medical needs of inmates."  The first claim for relief averred that Defendant Allred "is employed as Health Services Clinical Director over all Medical to include Dental for inmates of the ADX and is responsibile for seeing all inmates receive prompt and adequate medical and dental care," and is also "responsible for insuring that dental staff are available to treat the number of dental problems of ADX inmates insuring that inmates receive speedy treatment and not left days, weeks and months suffering dental problems."  In his Prayer for Relief, Mr. Stine requested compensatory damages, a declaration that dental care at ADX fails to meet constitutional standards, and the appointment of a special master "to help establish

---

third-party complaint, an answer to a third-party complaint, and a reply to answer.  *See* Fed. R. Civ. P. 7(a)(1)-(7).

adequate dental care for ADX inmates."

Mr. Stine's recent course of dental treatment is reflected in records filed with the court.[5] While the parties may disagree about the significance of individual events or the weight to be accorded particular record entries, Plaintiff's medical records reflect the following events.  On or about July 12, 2010, Mr. Stine wrote to Dr. Highsmith, a dentist at ADX, stating that he had "another tooth loosened and painful [;] can't eat on that side[;] can you call me up and pull it."[6] *See* Doc. #13-1, at page 13 of 45 (emphasis in original).[7]  Dr. Highsmith saw Mr. Stine on August 19, 2010 for treatment of a periapical abscess relating to tooth #25.  According to dental records, Mr. Stine was complaining of a toothache and described tooth #25 as "bother[ing] me on and off."  *See* Doc. #13-1, at pages 14-18 of 45. " Tooth #25 was extracted during Mr. Stine's August 19, 2010 visit to Dr. Highsmith, with instructions that Mr. Stine should "follow-up at Sick Call as needed."  In connection with the August 19, 2010 extraction, Mr. Stine apparently signed a "Universal Protocol for Invasive Dental Procedures" that identified the following possible complications from his tooth extraction: "continued or increased pain . . . swelling and infection . . . prolonged bleeding which could require further treatment or intervention . . . dry socket .. . sharp ridges or bone splinters which may require additional surgery to smoothen the

---

[5]This court may take judicial notice of documents in the public record, including the court's own docket.  *See, e.g., State Farm Mutual Automobile Insurance Co. v. Boellstorff*, 540 F.3d 1223, 1126 no.7 (10th Cir. 2008.

[6]Mr. Stine's contacts with the ADX Dental Clinic pre-date July 2010.  Records indicate that Mr. Stine was complaining of oral pain, swelling and infection as early as January 2010.  There is some indication in Plaintiff's medical records that Mr. Stine declined dental treatment in January and June 2010.  *See* Doc. #13-1, at pages 8-12 of 45.

[7]Multiple copies of the same excerpts from Mr. Stine's medical records have been proffered by both sides in conjunction with various filings.  For convenience, the court has cited only one docket entry for each referenced document.

6

area . . . [or] muscle soreness or restricted opening of the mouth." *See* Doc. #13-1, page 18 of

45.

Later on August 19, 2010, Mr. Stine sent a "emergency cop-out" to Dr. Highsmith stating

that "after numbness wore off, the teeth on both sides [of the extraction site] are really loose and

I even touch and it like super bad pain." The cop-out went on to state that his teeth "hurt way

worse than the abscessed tooth did. I mean second you touch either tooth its immediate 10-

pain." Dr. Highsmith responded in writing on August 20, 2010 by telling Mr. Stine that

> what you are experiencing is normal after an extraction. . . . When the tooth
> socket fills in with gum and bone, the teeth on both sides will tighten up. You'll
> probably have the most discomfort tomorrow - Saturday. The inflamation is
> usually at its peak two days after an extraction.

*See* Doc. #13-1, page 19 of 45.

On October 3, 2010, Mr. Stine wrote to "Dentist/ADX" stating he had "abscess need to

get it pulled painful/bad." *See* Doc. #13-1, at page 20 of 45. The next day, Mr. Stine received a

response indicating that he "[had] been added to dental sick call list." *Id.* An Administrative

Note in Mr. Stine's medical records prepared by Defendant Allred on October 4, 2010

acknowledged Plaintiff's cop-out complaining of "abscess" and pain, and prescribed "empiric

antibiotic pending dental follow-up." According to Dr. Allred's Administrative Note, Mr. Stine

was prescribed Amoxicillin and Ibuprofen. *See* Doc. #13-1, at page 21 of 45.

On October 24, 2010, Mr. Stine again wrote to Dr. Highsmith regarding "abscessed +

painful tooth." Plaintiff noted that "[o]n approximately 2-weeks ago I wrote about my tooth.

They sent my ibuprohen of which can't take because Hep-C and Amoxicillin of which I took . . .

the tooth is worse . . . can't chew, etc.." Mr. Stine asked Dr. Highsmith to "[p]lease call me up

and pull this tooth out. I can't eat, etc. and very painful." *See* Doc. #13-1, at page 22 of 45. The

next day, Mr. Stine received a response indicating that he was "still on the sick call list."

In a record entry dated November 6, 2010, MLP Camacho described a "clinical encounter" he had with Mr. Stine.  At that time, Mr. Stine complained that he was suffering from "toothache with gum swelling" and that he had "already submitted a Dental cop-out about a month ago, but haven't seen the dentist yet."  Mr. Stine requested "antibiotic and pain medication."  *See* Doc. #13-1, at page 23 of 45.  MLP Camacho examined Mr. Stine's mouth and noted "mild edema . . . on gum surrounding lower incisor tooth; fair dental hygiene; receding gumline . . . ; no active discharge/bleeding."  *Id.*  Mr. Stine was prescribed Penicillin and Acetaminophen, and told that he "will be placed on callout."  *See* Doc. #13-1, at page 24 of 45.  Dr. Lorincz, an ADX dentist, co-signed MLP Camacho's note on November 8, 2010. *See* Doc. #13-1, at page 25 of 45.

Mr. Stine was examined by Dr. Lorincz on November 10, 2010 during a sick call visit at the Dental Clinic.  *See* Doc. #13-1, at page 26 of 45.  At that time, Mr. Stine complained of pain associated with tooth #21 and tooth #26.  Dr. Lorincz noted that "#21 has pain level 3 . . . and is non-restorable due to failed endodontics."  The same note indicated that "#26 has pain level 6 and is non-restorable due to pain/abscess."  *Id.*  Both teeth were extracted on November 10, 2010, with "follow-up at Sick Call as needed."  Dr. Lorincz also prescribed Salsalate for puplitis and continued prescriptions for Acetaminophen, and Amoxicillin.  *See* Doc. #13-1, at pages 27-28 of 45. On November 10, 2010, Mr. Stine once again signed a "Universal Protocol for Invasive Dental Procedures" that listed possible complications including "continued or increased pain . . . swelling and infection . . . prolonged bleeding which could require further treatment or intervention . . . dry socket .. . sharp ridges or bone splinters which may require additional

8

surgery to smoothen the area . . . [or] muscle soreness or restricted opening of the mouth." *See* Doc. #13-1, at page 31of 45.

Plaintiff submitted another cop-out on November 28, 2010 to "Dentist/ADX" indicating that he had a tooth "that's painful every time I push or touch it . . . it shoots real sharp pain."[8] Mr. Stine asked to be "called up" and to have the tooth pulled.  *See* Doc. #13-1, at page 33 of 45.  Mr. Stine received a response on December 2, 2010 indicating that he "[had] been added to the list."  *Id.*

Mr. Stine filed his original Complaint 43 days later on January 14, 2011.  There is no indication that Mr. Stine received any dental care between December 2, 1010 when he was "added to the list," and January 14, 2011.[9]

On February 3, 2011, Dr. Lorincz treated Mr. Stine for "throbbing/sharp" pain associated with tooth #8, tooth #10 and tooth #11.  Dr. Lorincz's notes reflected that "#8, 10, 11 are non-restorable due to bone loss/mobility/gum abscesses" and referenced "aggressive periodontitis, localized."  All three teeth were extracted during that visit to the Dental Clinic.  Once again, Mr. Stine was prescribed Ibuprofen and Amoxicillin, and told to "follow-up at Sick Call as needed." *See* Doc. #13-1, at page 37-39 of 45.

---

[8]On November 10, 2010, Mr. Stine submitted a cop-out asked to be put on a list for dentures.  *See* Doc. #13-1, at page 32 of 45.  On February 3, 2011, Dr. Lorincz told Plaintiff that he was on the list for dentures, but that there were "quite a few [patients] in front of him."  *See* Doc. #13-1, at page 40 of 45.

[9]Mr. Stine was seen by PA Osagie in D-Unit on December 29, 2010 and January 7, 2011. During the first encounter, Mr. Stine's "chief complaint" was a "skin problem" on his elbows and forearms, while on January 7, 2011, Mr. Stine complained about a knee problem and dizziness.  *See* Doc. 38-1, at pages 19 and 21 of 31.  The corresponding Clinical Encounter forms do not indicate that Mr. Stine made any complaints about his teeth or dental condition during these conversations with PA Osagie.

Emergency Medical Technician Huddleston prepared an Administrative Note on February 6, 2011 recounting a contact he had with Mr. Stine in D-Unit that same day. According to EMT Huddleston, Mr. Stine was complaining that he still had pain, swelling and some discharge in his mouth following the February 3rd extractions.  *See* Doc. #13-1, at page 43 of 45.  On February 9, 2011, MLP Osagie spoke with Mr. Stine in his housing unit.  At that time, Mr. Stine reportedly complained that he was out of antibiotics and "needs more because pain and infection have not subsided."  *See* Doc. #13-1, at page 45 of 45.  The Administrative Note prepared by MLP Osagie indicates that upon examination, Mr. Stine's mouth and gum showed "no evidence of infection and gums appears to be undergoing the appropriate healing process." Osagie also concluded that "[s]welling has subsided significantly."[10]  Mr. Osagie indicated that he ended his conversation with Plaintiff after Mr. Stine reportedly said: "Osagie, you know now, case is in the court and your name is on it . . . cruel and unusual punishment."  *Id.*

On February 24, 2011, Dr. Lorincz saw Mr. Stine for pain localized at the extraction sites for tooth #10 and tooth #11, and a "bump around apical #11 (buccal) area."  *See* Doc. #89, at page 15 of 28.  Dr. Lorincz's notes reflected his assessment that the extractions were "healing well, but some loss of clot in sockets."  Based on Dr. Lorincz's conclusion that Mr. Stine "needs meds/time," he prescribed Amoxicillin and topical Lidocaine.  *See* Doc. #89, at page 16 of 28. The notations from the February 24, 2011 visit to the Dental Clinic also reflect that Mr. Stine was told "we would start impression for immediate full upper denture. [Patient] wants all teeth

---

[10]Plaintiff Stine has challenged PA Osagie's qualifications to render opinions relating to dental diagnosis and treatment.  For purposes of this Order, the court is not required to address the substance of PA Osagie's opinions or his qualifications to render those opinions.  Those issues are more properly addressed with a motion under Fed. R. Evid. 702.

out."  *See* Doc. #89, at page 15 of 28.

Defendant Allred saw Mr. Stine on March 3, 2011 in conjunction with a "chronic care encounter performed at Health Services."  According to the medical records, Mr. Stine reported his "main concern today is [Dr. Allred's] supervision of dental, and their inability to attend to his needs, and an ongoing litigation of dental care," and described the pain level for his mouth as "2."  *See* Doc. #89, at page 18 of 28.  Dr. Allred's notes reflect that Mr. Stine had "missing teeth, poor oral hygiene," that his teeth were "sensitive to provoking stimuli," and that his gums exhibited "change of contour, inflammation."  *See* Doc. #89, at page 19 of 28. Ten days after seeing Dr. Allred, Mr. Stine filed his "Verified Emergency Motion for TRO and Preliminary Injunction" (doc. #35) on March 13, 2011.[11]

Plaintiff next saw Dr. Lorincz on March 17, 2011.  At that time, Mr. Stine complained of toothache that he attributed to "sharp bone spicule and upper left teeth (#12 and 13) bother."  *See* Doc. #89, at page 22 of 28.  According to Dr. Lorincz's notations, Mr. Stine indicated that he wanted those teeth removed.  Dr. Lorincz noted that "[b]one spicule #11 area is working its way out after extraction #11.  Also, #12 and 13 are non-restorable due to bone loss/abscesses."  *Id.* After determining these conditions could be ameliorated by removing the bone spicule and

---

[11]On June 23 2011, this court accepted for filing Mr. Stine's Second Verified Amended Complaint (doc. #107-2).  This pleading alleges a violation of the Eighth Amendment based upon a denial of dental treatment and joins as defendants in their individual capacities Warden Blake Davis, Associate Warden Munson, PA Osagie, EMT Huddleston, Assistant Health Services Administrator Smith, and Correctional Officer Manspeaker.  Mr. Stine's Second Amended Complaint also seeks injunctive relief against Defendant Federal Bureau of Prisons. The injunctive relief sought in the Second Amended Complaint largely mirrors the relief requested in Plaintiff's Verified Emergency Motion for TRO and Preliminary Injunction.  For purposes of deciding the instant motion, the court has looked to the Complaint in effect at the time Mr. Stine filed his Verified Emergency Motion.

extracting tooth #12 and tooth #13, Dr. Lorincz performed those procedures and prescribed Salsalate for pain. Mr. Stine was told to return to Sick-Call as needed." *See* Doc. #89, at pages 23-24 of 28.

Dr. Lorincz saw Mr. Stine again less than three weeks later on April 6, 2011.  At that time, Plaintiff was complaining of a toothache in the "[tooth] #9 area up toward nose, pt. cannot even touch spot due to pain." *See* Doc. #89, at page 25 of 28.  Dr. Lorincz smoothed the socket area in the area of teeth #9-#11 and put in a suture.  According to medical records, Mr. Stine "felt area to make sure sharpness was addressed." *Id*.  Dr. Lorincz also prescribed topical Lidocaine, Amoxicillin and Ibuprofen, and told Mr. Stine to "Follow-up at Sick Call as Needed." *See* Doc. #89, at page 27 of 28.

On April 14, 2011, this court held a hearing and addressed several pending motions in this case.  At the conclusion of that hearing, I set the instant motion for an evidentiary hearing on May 5, 2011 and further precluded Mr. Stine from filing any additional motions relating to his Verified Emergency Motion for TRO and Preliminary Injunction.[12]  I also directed that Mr. Stine be examined by a dentist at ADX, that photographs should be taken during the examination to document the appearance of Mr. Stine's teeth and gums, and that a report and copies of those photographs should be forwarded to the court.  *See* Minute Order (doc. #81).  The resulting report and photographs were appended to Defendant's Response to Motion for TRO and Preliminary Injunction and Supplements (doc. #93).

Mr. Stine returned to see Dr. Lorincz on April 20, 2011 for pain in the area of tooth #4,

_____

[12]Notwithstanding the court's instructions, on May 9, 2011, Mr. Stine filed a "Supplement" to his Reply in Response to Motion for TRO/Preliminary Injunction and Supplements (doc. #109).

tooth #5 and tooth  # 6.   Dr. Lorincz's notes indicate that Mr. Stine complained of "pain/can't eat/sharpness" and "want[ed] some bone smoothed."   *See* Doc. #93-2, at page 3 of 5.  Dr. Lorincz noted that "#3, 5, 6 areas all show dry socket/delayed healing," and advised Mr. Stine that "area needs to heal before any trimming can be done" and that "smoothing area now would further delay the already delayed healing."   *Id.*  Medical records reflect that Dr. Lorincz performed "dry socket irrigation and packing" in the tooth # 3, tooth #5 and tooth #6 socket areas, and again prescribed Amoxillin, topical Lodicaine, and Salsalate.  Dr. Lorincz also directed that Mr. Stine receive one can of Resource 2.0, a nutritional supplement, every day for ten days.   *See* Doc. #93-2, at page 4 of 5.

On April 23, 2011, Emergency Medical Technician Vanaman encountered Mr. Stine during a visit D-Unit.  An Administrative Note prepared by EMT Vanaman that same day indicates that Mr. Stine was complaining that "medical and dental are refusing to treat me and are being 'indifferent,'" and "you are not addressing my problems and I have an emergency."[13]  *See* Doc. #104-6, at page 4 of 13.  Although Mr. Stine complained of bone in the area of a recent extraction and insisted that he "need[ed] to be seen by a dentist immediately," EMT Vanaman concluded that Plaintiff's "gums do not look infected - look as though they are healing at extraction sites."   Although Mr. Stine apparently claimed his face was swollen, EMT Vanaman noted that "it does not appear to be inflamed, red or swollen."  After reviewing the documentation concerning Mr. Stine's recent dental treatment, EMT Vanaman concluded that

---

[13]During the conversation with EMT Vanaman, Mr. Stine complained that he was "not receiving enough Resource to 'sustain him.'" Mr. Stine remained very irate when EMT Vanaman pointed out that his prescription was for "one carton daily, not two."  *See* Doc. #104-6, at page 4 of 13.

Mr. Stine was not experiencing a medical emergency that required evaluation or treatment at a local emergency room. *Id.* Medical records indicate that Dr. Lorincz reviewed EMT Vanaman's Administrative Note on April 25, 2011. *See* Doc. # 104-6, at page 5 of 13.

Mr. Stine submitted an "Emergency Cop-Out/Request" on April 23, 2011 "to Dentist," in which he wrote:

> I've dry sockets infection is speading (sic) to complete upper gum. The pain is off the scale. I can't eat sleep and hard to talk. I need to see someone right away. Bone is exposing in one of the area's real sharp actually cuts the gum area. Thank you.

*See* Doc. #110, at page 4 of 6. Mr. Stine received a response indicating that he was "back on the list." *Id.*

Dr. Matthes, another ADX dentist, treated Mr. Stine on April 28, 2011. According to Dr. Matthes, Mr Stine's chief complaint was "pain" at the extraction sites for tooth # 5, tooth #6 and tooth #7. Dr. Matthes concluded that these extraction sites were "not healing well" and noted "several areas of sharp bone protruding through tissue." *See* Doc. #104-6, at page 6 of 13. With Mr. Stine's consent, Dr. Matthes removed the "sharp bone," applied sutures to the area and prescribed topical Benzocaine with instructions for Mr. Stine to apply as needed. *Id.* Mr. Stine also was prescribed "Ensure 2x day" until May 5, 2011. *See* Doc. #104-6, at page 9 of 13.

Defendant Allred had contact with Mr. Stine on May 2, 2011. An Administrative Note prepared by Dr. Allred acknowledged that Mr. Stine's last blood pressure reading "did not meet guidelines," but that "follow-up was not ordered." *See* Doc. #104-6, at page 10 of 13. Dr. Allred prescribed Amlodipine and placed Mr. Stine on a schedule to have his blood pressure taken on May 9, 16, 23 and 30, 2011.

On May 3, 2001, Mr. Stine saw Dr. Lorincz at the Dental Clinic and reported his

14

"denture is loose and a bone spur bothers him #11 area."  Mr. Stine also stated that he suffered

pain when his denture was in his mouth and that he wanted his sutures removed.  *See* Doc. #104-

6, at page 12 of 13.  Dr. Lorincz explained to Mr. Stine that the

> area needs time to heal.  After it is healed, even if it takes a year, upper denture
> may be relined or a new denture made. [Patient] asked about lower denture, and I
> suggested that he wait and get used to an upper denture first before fabricating a
> lower denture because it is hard to get used to that much "hardware" in the mouth
> at one time.

*See* Doc. #104-6, at page 13 of 13.

I held a hearing on Plaintiff Stine's  Verified Emergency Motion for TRO and

Preliminary Injunction (doc. 35) on May 5, 2011. During that approximately two-hour hearing,

the court received testimony under oath via video from Correctional Officers Goff and Anderson

(who were called as witnesses by Mr. Stine) and Dr. Lorincz (called by defense counsel) who

appeared by telephone.  Officer Goff testified that he was assigned to D-Unit, Mr. Stine's

housing unit, for a portion of 2010 and then again during the first quarter of 2011.  While

assigned to D-Unit in 2010, Officer Goff was aware that Mr. Stine had some back teeth

extracted.  Officer Goff recalled that after he returned to D-Unit in January 2011, Mr. Stine

complaind of pain and bone sticking out of his gum.  In response to questioning from Mr. Stine,

Officer Goff said that he would take a family member complaining of pain to see a dentist and

expressed his belief that Mr. Stine should have been seen by a dentist within two or three days of

complaining of pain.  Officer Goff said, however, that he did not know how long it would

customarily taken to be seen by a dentist after an inmate submitted a cop-out and did not know

how frequently dentists were available at ADX.  On those occasions when Mr. Stine complained

of pain, Officer Goff called the on-duty PA who would later stop by Mr. Stine's cell.  Goff

recalled that on a "couple" of occasions, he saw the PA shine a flashlight in Mr. Stine's mouth, but he never saw a PA provide immediate treatment in response to Plaintiff's complaints.

Correctional officer Anderson recounted two occasions when he had contact with Mr. Stine relative to dental issues.  On March 17, 2011, Officer Anderson escorted Mr. Stine to the Dental Clinic and at that time Plaintiff was in considerable pain.  Officer Anderson remained at the Dental Clinic while Dr. Lorincz addressed a bone fragment in Mr. Stine's gum.  On April 6, 2011, Officer Anderson was assigned to D-Unit and observed "moderate bleeding" from Mr. Stine's mouth and coming down his chin.  Officer Anderson testified that he instructed Plaintiff to keep pressure on his gum and then called EMT Rogers to request assistance.  EMT Rogers apparently said that he would come to D-Unit with gauze.  Officer Anderson passed by Mr. Stine's cell approximately an hour later and noticed that Plaintiff's mouth was still bleeding. Rogers did not appear until three hours later during the routine "pill-line," and at that time did not give Mr. Stine any gauze.  However, Officer Anderson testified that by the time EMT Rogers did check on Mr. Stine, the bleeding had stopped.  Although Mr. Stine complained to EMT Rogers about pain, Rogers simply told him to "step back" into his cell and provided no other treatment.  *See* Doc. #110, at page 3 of 6.

Doctor Lorincz testified on May 5, 2011 that he is currently the Chief Dental Officer for ADX.  In that capacity, Dr. Lorincz receives supervision from the ADX Clinical Director, but his immediate supervisor is the Associate Warden.  There is also a Regional Dental Officer located in Florence, Colorado and a Chief Dentist in Washington, D.C.  According to Dr. Lorincz, Mr. Stine's medical records reflect chronic gum disease dating back to December 2008.  Dr. Lorincz testified that as of the May 5, 2011 hearing, he was not aware of any additional dental care that

Mr. Stine currently required but conceded that he could not predict Mr. Stine's future dental needs.  In response to questions from the court, Dr. Lorincz indicated that three dentists are now available to treat prisoners at ADX, but dentists are specifically assigned to ADX three days a week (Monday, Wednesday and Thursday).  Dr. Lorincz also acknowledged that how quickly an ADX prisoner could see a dentist on other days "would depend upon the complaint."  Dr. Lorincz was not aware of any independent authority Dr. Allred had with respect to hiring dentists or assigning duties to correctional officers.

## ANALYSIS

Mr. Stine's Verified Emergency Motion for TRO and Preliminary Injunction (doc. #35), filed on March 15, 2011, insists that injunctive relief is required "to prevent further serious physical injury to Plaintiff and similarly situated inmates incarcerated at Florence ADX pursuant to Fed. R. Civ. P. 65(a)."  The motion contends that "Defendants continued pattern conduct has caused additional misconduct that has caused further serious injury to Plaintiff and unnecessary pain," that the "complete denial of dental care by Defendants and delayed dental treatment allows conditions to worsen and inmates (including Plaintiff to suffer unnecessary pain) for days, month and even years in ADX," that Defendants and other BOP staff "have directed institutional dentists to not give further treatment because any treatment given to Plaintiff supports claims and the Complaint is not dismissed," and that "Plaintiff  and similarly situated ADX inmates will suffer imminent danger; irreparable injury and irreparable harm; and serious physical injury, if this court denys (sic) expedited TRO/Preliminary Injunction."

With his motion for preliminary injunctive relief, Mr. Stine seeks an order that:

1.  "BOP and [Defendant Allred] shall immediately employ two licensed dentists 5-days a week" and "one shall be on call nightly and on weekends to provide

treatment to Plaintiff and ADX inmates;"

2.    "That [Defendant Allred] and BOP shall immediately provide at least (1) dental
      assistant to walk all units daily Monday through Friday to address inmates dental
      needs and priortise (sic) the needs and determine what is an emergency dental
      need of inmates requesting dental treatment;"

3.    "That [Defendant Allred] and Bureau of Prisons shall immediately assign at least
      (4) correctional officers to dental each day;"

4.    "That at least once weekly, [Defendant Allred] and BOP shall provide an oral
      surgeon to evaluate treatments + need or stated by one of institutional dentist, and
      if surgery is needed, it will be provided to the inmate within (10) days of oral
      surgeon's evaluation;" and

5.    "That dental sick call shall be provided by dental assistant (5) days a week
      Monday through Friday and if inmate has issue arising on weekend or after hours
      staff shall immediately call the on-call dentist for treatment . . . and BOP +
      [Defendant Allred] shall transport inmate to emergency dental facility to provide
      the necessary treatments."

The Court must construe Mr. Stine's motion liberally because he is not represented by an

attorney. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106,

1110 (10th Cir. 1991). However, the court should not be an advocate for a *pro se* litigant. *See*

*Hall v. Bellmon*, 935 F.2d at 1110.

Defendant Allred opposes Plaintiff's Verified Emergency Motion for TRO and

Preliminary Injunction, arguing that Mr. Stine's case must be dismissed for failure to exhaust his

administrative remedies and, therefore, no further inquiry into the merits of his claims is

appropriate. In the alternative, Defendant Allred contends that Mr. Stine cannot meet the

standards for obtaining injunctive relief.

"The purpose of a preliminary injunction is to preserve the relative positions of the

parties until a trial on the merits can be held." *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d

1237, 1241 (D. Colo. 2007) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395

18

(1981)).  *See also Valley Community Preservation Commission v. Mineta*, 246 F. Supp.2d 1163,

1165-66 (D.N.M. 2002), *aff'd*, 373 F.3d 1078 (10th Cir. 2004) (noting that the substantive

requirements for granting a temporary restraining order and preliminary injunction are identical).

Under Rule 65(b) of the Federal Rules of Civil Procedure, a temporary restraining order or

preliminary injunction may be granted only if "it clearly appears from specific facts shown by

affidavit or by the verified complaint that immediate and irreparable injury, loss or damage will

result to the applicant."

A moving party must meet four prerequisites for temporary or preliminary injunctive

relief:  (1) demonstrate a substantial likelihood that he will eventually prevail on the merits; (2)

show that he will suffer irreparable injury unless injunctive relief is provided; (3) offer proof that

the threatened injury to the movant outweighs whatever damage the proposed injunction may

cause the opposing party; and (4) show that the injunction, if issued, would not be adverse to the

public interest.  *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001) (citation omitted).  *See*

*also Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).  "[B]ecause a preliminary injunction

is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Soesbe v.*

*Countrywide Home Loans*, 2009 WL 3418212 * 1 (D. Colo. Oct. 20, 2009).  *See also RoDa*

*Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (because "the primary goal of a

preliminary injunction is to preserve the pre-trial status quo," a court "should be especially

cautious when granting an injunction that requires the nonmoving party to take affirmative

action - a mandatory preliminary injunction - before a trial on the merits occurs").

"Furthermore, a court must be cognizant of the fact that there are three types of

disfavored preliminary injunctions: (1) preliminary injunctions that alter the status quo-defined

as the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing; (2) mandatory preliminary injunctions which require a party to take some affirmative act rather than refrain from some act; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Soesbe v. Countrywide Home Loans*, 2009 WL 3418212 at *1. "Such disfavored injunctions must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Schrier v. Univ. of Colorado.,* 427 F.3d 1253, 1259 (10th Cir. 2005).  Mr. Stine seeks a mandatory order requiring substantial personnel and staffing changes at ADX.  For this reason, the temporary restraining order/preliminary injunction sought by Plaintiff  "constitutes a specifically disfavored injunction" that "must be more closely scrutinized." *Id.* at 1259, 1261.

Based upon the available record, I find that Mr. Stine has not sustained his heightened burden of establishing all of the required factors for injunctive relief.

As to the first factor, Mr. Stine must demonstrate a substantial likelihood that he will eventually prevail on the merits.  It is well-established that the Eighth Amendment prohibits prison officials from being deliberately indifferent to the serious medical needs of prisoners in their custody.  *See Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976).  "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  *Id*. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 182-83 (1976) (internal citations omitted).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards intentionally denying or delaying access to medical care or intentionally interfering with the treatment once

prescribed." *Id.* No one can reasonably dispute that the provision of adequate dental care is subsumed within the Eighth Amendment prohibition against cruel and unusual punishment. *See, e.g., Stack v. McCotter*, 79 Fed. Appx. 383, 388 (10th Cir. 2003).

In order to assert an Eighth Amendment claim against Defendant Allred, Mr. Stine must demonstrate that (1) he suffered objectively serious dental needs and (2) that Dr. Allred actually knew of but deliberately disregarded those needs. *See Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). *See also Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). To satisfy the first prong of this test, an objectively serious medical need or condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996).[14] In this case, where Plaintiff is alleging a delay in dental care, he must show that the alleged delay resulted in substantial harm.

> That "substantial harm" can be the ultimate physical injury caused by the prisoner's illness, so long as the prisoner can show that the more timely receipt of medical treatment would have minimized or prevented the harm. The "substantial harm" can also be an intermediate injury, such as the pain experienced while waiting for treatment and analgesics. Although "not every twinge of pain suffered as a result of delay in medical care is actionable," when the pain suffered during the delay is substantial, the prisoner "sufficiently establishes the objective element of the deliberate indifference test."

*Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006) (quoting *Sealock v. Colorado*, 218

---

[14]Factors that may be indicative of a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain," as well as the "potential for harm if medical care is delayed or denied." *Gutierrez v. Peters*, 111 F.3d 1364, 1373, n. 8 (7th Cir. 1997) (internal quotation marks and citation omitted).

F.3d 1205, 1210 (10th Cir. 2000)), *overruled on other grounds, Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008).

Documentation available to the court indicates that Mr. Stine submitted a request for dental care on November 28, 2010, claiming that he was experiencing "shooting" pain every time his tooth was touched or pushed. In the same cop-out, Mr. Stine asked to be "called up" and have the tooth extracted. On December 2, 2010, Mr. Stine supposedly was placed on the "list" for dental care and then nothing happened for nearly two months. For purposes of the instant motion only, the court will presume that Mr. Stine has presented evidence of an objectively serious dental condition that required treatment and a substantial delay in care. *Cf. McGowan v Hulick*, 612 F.3d 636, 640-41 (7th Cir. 2010) (suggesting that allegations of painful symptoms coupled with a delay of three months in providing treatment could support a constitutional claim if the defendant was aware of the severity of the dental problems yet refused to approve a dental visit); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (holding that a three-week delay in dental care, coupled with knowledge of the inmate-patient's suffering, can support a finding of an Eighth Amendment violation).

To prevail on his Eighth Amendment claim, however, Mr. Stine also must come forward with facts to present a genuine triable issue as to whether Defendant Allred had a sufficiently culpable statement of mind. For a prison official to be found liable of deliberate indifference, "the official 'must know[] of and disregard [] an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference." *Perkins v. Kansas Dept. of Corrections*,

165 F.3d 803, 809 (10th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).[15]

Mr. Stine must present evidence sufficient to support an inference that Defendant Allred knew

about and disregarded a substantial risk of harm to his health.  *Hunt v. Uphoff*, 199 F.3d 1220,

1224 (10th Cir. 1999).  To make out a claim for deliberate indifference under the Eighth

Amendment, Plaintiff must show "more than ordinary lack of due care for the prisoner's interests

or safety."  *See Farmer v. Brennan*, 511 U.S. at 835.  *Compare Edmisten v. Werholtz*, 287 Fed.

Appx. 728, 733 (10th Cir. 2008) (in holding that the inmate-plaintiff had facially met the

requirements for a preliminary injunction, noted that "defendants' intentional interference with

prescribed or recommended treatment, delay in providing medical care, and failure to fulfill a

gatekeeper role, if proven, satisfy the test for deliberate indifference under the Eighth

Amendment") and *Williamson v. Correctional Medical Services*, 2007 WL 2698256, at *2 (D.

Del. 2007) (noted that plaintiff was receiving consistent dental treatment and his gum condition

was being monitored; "[w]hile plaintiff may not like the type of care he received, it cannot be

said that there is a deliberate indifference to his serious dental needs").

It should be noted that the "negligent failure to provide adequate medical care, even one

constituting medical malpractice, does not give rise to a constitutional violation."  *Self v. Crum*,

439 F.3d 1227, 1233 (10th Cir. 2006).  An Eighth Amendment claim is not asserted "if a

prisoner's complaint is directed at the wisdom or quality of the medical care he received in

prison, even if that treatment is so negligent as to amount of medical malpractice."  *Brinton v.*

---

[15]To the extent that Defendant Allred was serving as a "gatekeeper" for medical
personnel capable of treating Plaintiff's condition, he may be liable under the Eighth
Amendment to the extent that he delayed or refused to fulfill that gatekeeper role.  *See Mata v.
Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colorado*, 218 F.3d at 1211)).

*Gaffney*, 554 F. Supp. 388, 389 (E.D. Pa. 1983).  *See also Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) (simple negligence or inadvertent failure to provide adequate medical care does not constitute the unnecessary and wanton infliction of pain).  Moreover, a "prisoner's right is to medical care, not to the type or scope of medical care which he personally desires." *Henderson v. Secretary of Corrections*, 518 F.2d 694, 695 (10th Cir. 1975) (internal quotation marks and citation omitted).  The Constitution does not guarantee a prisoner the treatment of his choice.  *Ledoux v. Davis,* 961 F.2d at 1537 (citations omitted).

It is understood that a defendant may not be held liable for constitutional violations merely because he or she holds a supervisory position.  "Government officials may not be held liable for the constitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1948 (2009) (citation omitted).  A supervisor is only liable for their own culpable involvement in the violation of a person's constitutional rights.[16]  *Serna v. Colorado Department of Corrections*, 455 F.3d 1146, 1151-52 (10th Cir. 2006). "Because vicarious liability is inapplicable to *Bivens* . . . , a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. at 1948.

Mr. Stine's original Complaint is devoid of any facts that would establish or suggest Dr.

---

[16]The original Complaint purported to assert a Eighth Amendment claim against Dr. Allred in his "official and individual capacity."  "Sovereign immunity bars a *Bivens*-type action against a United States agent in his or her official capacity."  *Kelly v. Wilson*, 2011 WL 2311875, at *3 (10th Cir. 2011).  While an "official capacity" claim against a United States employee operates as a claim against the United States, I note that Judge Babcock dismissed the Bureau of Prisons from this action with his Order of March 7, 2011.  Moreover, the original Complaint does not assert jurisdiction or seek relief under the Administrative Procedures Act, 5 U.S.C. § 702.  *See Simmat v. United States Bureau of Prisons*, 413 F.3d 1225 (10th Cir. 2005).

Allred's personal participation in a constitutional violation.  The original Complaint alleged that as the Health Services Clinical Director at ADX, Dr. Allred "is responsible for seeing all inmates receive prompt and adequate medical and dental care," and is "responsible for insuring adequate dental staff are available to treat the number of dental problems of ADX inmates insuring that inmates receive speedy treatment and not left days weeks and months suffering dental problems."  There are no facts alleged in the original Complaint from which the court could infer that Defendant Allred was deliberately indifferent to Mr. Stine's dental care during the period from November 28, 2010 to January 14, 2011.  Indeed, there is no indication from Mr. Stine's medical records that he saw Dr. Allred for dental treatment during that same period of time.[17] Based upon Mr. Stine's medical records and the allegations set forth in the original Complaint, I am not convinced that Mr. Stine has clearly established a substantial likelihood of success on his "individual capacity" claim against Defendant Allred.

To obtain relief under Rule 65, Mr. Stine also must show that he will suffer irreparable injury unless injunctive relief is provided.  "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical."  *Schrier v. University of Colorado*, 427 F.3d at 1267 (citation omitted).  Even "serious or substantial harm is not irreparable harm." *Id*.  "The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  *Id.*  "The purpose of

---

[17]On October 4, 2010, Dr. Allred prescribed Amoxicillin and Ibuprofen "pending dental follow-up" in response to a an October 3, 2010 cop-out from Mr. Stine complaining of abscesses and pain.  Dr. Allred also saw Mr. Stine on March 3, 2011 for a "chronic care encounter" at which time Plaintiff complained about Dr. Allred's "supervision of dental, and their inability to attend to [Mr. Stine's] needs and an ongoing litigation of dental care."  Mr. Stine received treatment from Dr. Lorincz ten days later.

a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable

injury that will surely result without their issuance." *Id.*  While the moving party is not required

to demonstrate the certainty of an injury occurring, a speculative injury or the mere possibility of

harm will not suffice for the issuance of a preliminary injunction.  *Hills Pet Nutrition, Inc. v.*

*Nutro Products, Inc.*, 258 F. Supp.2d 1197, 1205-06 (D. Kan. 2003).

        Mr. Stine argues that the "irreparable injury" factor has been established by virtue of

Judge Babcock's March 7, 2011 Order finding that Mr. Stine's "dental issues require further

review."  More specifically, Mr. Stine contends that his right to bring this case was contingent

upon his ability to show that he was "under imminent danger of serious physical injury,"

pursuant to 28 U.S.C. § 1915(g).[18]  Plaintiff reasons that Judge Babcock must have found

"imminent danger of serious physical injury" by virtue of his decision to allow the case to

proceed.  However, the determination of whether a prisoner is in imminent danger of serious

physical harm is made as of the time the prisoner seeks to file the complaint.  *Green v. Ortiz*,

2007 WL 552236, at *2 (D. Colo. 2007).  I finding nothing in the case law to suggest that the

court's analysis under Rule 65 is similarly frozen in time or that the court is precluded from

considering subsequent events in determining whether the "extraordinary remedy" of injunctive

relief is warranted.  The finding necessary to satisfy § 1915(g) does not bind this court in

applying the four-factor test required by Rule 65.  *Cf. Brown v. Diguglielmo*, 2007 W 4570727,

at *3 n.5 (E.D. Pa. 2007) (noting that "[t]he evidentiary burden required to warrant the

---

[18]As Magistrate Judge Boland acknowledged in his Order of February 1, 2011,  Mr. Stine
is subject to the filing restrictions under § 1915(g), which apply where an incarcerated prisoner
on three or more occasions has brought an action or appeal that was dismissed on the grounds
that it was frivolous, malicious or failed to state a claim upon which relief could be granted.
District Judge Brimmer

'extraordinary relief' of a preliminary injunction is substantially higher than the burden required to warrant an initial grant of leave to proceed in forma pauperis").

To the contrary, the record demonstrates that between January 14, 2011, the day this action commenced, and May 5, 2011, Mr. Stine received treatment from ADX dentists on seven different occasions. *Cf. Williamson v. Correctional Medical Services*, 2007 WL 2698256, at *2-3 (D. Del. 2007) (the inmate-plaintiff sought a preliminary injunction requiring the provision of standard dental treatment for periodontal disease and a crown and root canal to repair a broken tooth; in denying the motion for preliminary injunction, noted that plaintiff's dental records indicated he had received appropriate dental treatment and that his gum condition was being monitored); *Niemic v. Maloney*, 409 F. Supp. 2d 32, 38 (D. Mass. 2005) (plaintiff-inmate moved for preliminary injunctive relief that would require defendants to provide medically appropriate treatment and move plaintiff to a medical facility to receive that treatment; in denying the request for injunctive relief, held that plaintiff not demonstrated an imminent danger of irreparable harm in light of the medical care recently afforded to plaintiff). I do not find that the available record clearly or unequivocally shows that Mr. Stine will suffer irreparable injury unless the specifically requested relief is provided.

Finally, in determining whether preliminary injunctive relief is appropriate, the court must balance the competing interests of the movant, the defendant and the public. In undertaking this balancing analysis, it is generally understood that federal courts should not immerse themselves in the management of prisons. *See, e.g., Taylor v. Freeman*, 34 F.3d 266, 268, 269 (4th Cir. 1994) (holding that "sweeping intervention in the management of . . . prisons is rarely appropriate when exercising the equitable powers of the federal courts . . . especially . . .

where mandatory injunctive relief is sought and only preliminary findings as to the plaintiff['s]

likelihood of success on the merits have been made").  *Cf. Escobar v. Jones*, 2011 WL 1642429,

at *2 (D. Colo. 2011); *Aranda v. McCormac*, 2009 WL 3839331, at *8 (D. Colo. 2009).  Here,

Mr. Stine would have the court effectively micro-manage the provision of dental care at ADX

and intrude in an area that is better left to the expertise of BOP officials and medically-trained

professionals.  *Cf.  Washington v. Hutchinson*, 2009 WL 5217655, at *4 (E.D. Mich. 2009).  I

find that extreme step is not warranted by the facts of this case.

      The breadth of Mr. Stine's proposed injunctive relief is not appropriately tailored to the

specific constitutional violation alleged in the original Complaint.  Although Mr. Stine's motion

broadly alludes to serious physical injury inflicted on "similarly situated inmates incarcerated at

Florence ADX," this is not a class action.  *Cf. Fymbo v. State Farm Fire and Casualty Co.*, 213

F.3d 1320, 1321 (10th Cir. 2000) ("A litigant may bring his own claims to federal court without

counsel, but not the claims of others.").

      "It is well settled [that] an injunction must be narrowly tailored to remedy the harm

shown."  *ClearOne Communications, Inc. v. Bowers*, 643 F.3d 735, 752 (10th Cir. 2011) (quoting

*Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002)).  *Cf.*

*Pollgreen v. Morris*, 496 F. Supp. 1042, 1058 (S.D. Fla. 1980) ("'[w]henever the extraordinary

writ of injunction is granted, it should be tailored to (compel) no more than what is reasonably

required to accomplish its ends'").  Mr. Stine's sweeping request for injunctive relief could not

be considered narrowly tailored or commensurate with the specific violation alleged in this case.

*Cf. Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) (the scope of injunctive relief should be

strictly tailored to accomplish only that which the situation specifically requires) (quoting

*Aluminum Workers International Union Local Union No. 215 v. Consolidated Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982)).  *See also Dean v. Coughlin*, 804 F.2d 207, 214 (2d Cir. 1986) (several prisoners commenced a class action challenging the correctional facility's existing system of providing dental care; in vacating the preliminary injunction entered in favor the prisoners, concluded that the district court "went too far and too fast in imposing upon the state correctional facility its own ideas of how a prison dental clinic should be organized and administered rather than giving appropriate deference" to the defendants' plan").

The court should emphasize that in denying Mr. Stine's motion for injunctive relief the court is expressing no opinion as to the ultimate merits of Plaintiff's underlying Eighth Amendment claim for denial of adequate dental care.  The resolution of that claim for relief is more appropriately addressed through a motion for summary judgment or at trial.

## CONCLUSION

Accordingly, for the foregoing reasons, Plaintiff Stine's Verified Emergency Motion for TRO and Preliminary Injunction (doc. #35) is DENIED.


DATED this 25th day of August, 2011.

BY THE COURT:


s/ Craig B. Shaffer
Craig B. Shaffer
United States Magistrate Judge